## THE JAMES MARTIN.[1]

### (District Court, E. D. Virginia. February 10, 1883.)

1. SHIPPING—ABANDONMENT OF VESSEL BY CREW—EVIDENCE.

Where the master and crew have abandoned their vessel under circumstances raising a grave suspicion that they dismasted and scuttled her, but. on a libel by the cargo owners and their insurers, the master and claimants assert that the injury was caused by collision, the failure of the latter to examine several members of their crew, who were disinterested, or to libel the vessel with which they pretend to have collided (the collision being denied), or examine any members of her crew in regard to the alleged collision, is prejudicial to their case.

2. SAME—FREIGHT—ABANDONMENT.

When a vessel and cargo are abandoned at sea by the master and crew. without intention to retake them, the shipowner can maintain no claim to the freight.

3. SAME—BAD SEAMANSHIP.

Where a master and crew abandoned their vessel, claiming that she was sinking, but she was afterwards found riding safely and not leaking seriously, and the circumstances were such as to raise a grave suspicion that she had been purposely dismasted, and an attempt made to scuttle her, *held* that, because of bad seamanship and negligence, the ship was liable for the amounts paid for salvage, and as damages to the cargo, by the insurers.

## Note of evidence by the judge:

The schooner James Martin, 225 tons, was owned in Boston by several persons; William H. Browne, her master, owning an eighth part. This part was insured at $800, and had been insured at that rate for 12 years. The schooner was 25 years old. In March last she took on a cargo of fertilizers, to the amount of 260 tons, consigned to Allison & Addison, in Richmond, Va. This cargo was insured with the Virginia Fire & Marine Insurance Company, one of the libelants here. The fertilizer was worth $40 per ton, or some $6,000 or $7,000. When the Martin was about ready to sail from Boston, Capt. Browne, her master and part owner, found himself in negotiation for the purchase of another vessel. He telegraphed to a town in Massachusetts for Rowland Howes, and employed him to go on this voyage as temporary master of the Martin. The mate of the schooner was A. C. Browne, brother of the part owner and regular master, William H. Browne. The vessel was towed out of Boston Harbor on the 14th of March, 1882, and sailed on her voyage. By midnight of the 23d March she was off Cape May, some six miles distant. The wind was W. N. W. She was going south, making for the Virginia cap. s. Her master, Rowland Howes, testifies as to subsequent events substantially as follows: "About midnight of the 22d March,—we being closehauled, on starboard tack, wind W. N. W., and going south, with reefed mainsail, and with foresail and jib boom set, weather fair, but cloudy, and a strong breeze,— we were run into by a three-masted schooner, of about 700 tons, afterwards learned to have been the Wm. H. Baily, of New York. She was standing northward, and must have had the wind free. We saw her about 3 miles off. She was on the port tack. She was under full sail. After she had got nearly abreast of us, she suddenly luffed up, tacked ship, and ran in under our lee, and struck us on our port bow. She carried away our jib boom, cathead rail and bulwarks, and damaged the top of the top gallant forecastle. Both vessels had their lights set. It was a clear night. We were obliged to cut adrift the jib boom and the sails attached to it, to prevent damage to the vessel. All the rigging attached to the flying jib and the jib

---

[1] This case has been heretofore reported in 5 Hughes, 448, and is now published in this series, so as to include therein all circuit and district court cases elsewhere reported which have been inadvertently omitted from the Federal Reporter or the Federal Cases.

topsail boom was cut adrift, including the jib-boom guys on the starboard side. We examined the rigging after the collision, and found it in apparently good order. We then proceeded on our course. For the rest of the night the wind shifted around from W. N. W. to N. W. We continued under same sail as before. Next day, wind N. W. to S. W., went nearly around the compass and quite moderate. For three hours after the collision, until we got off Chincoteague, sea was comparatively smooth; that is, for the rest of the night after the collision, and all the next day. At 2 a. m. on the morning of the 24th, twenty-six hours after collision, a heavy sea had set in from the southward. Wind S. W. by S. While we were on the starboard tack, both masts came suddenly down with a crash, caused by the chain parting, which the starboard jib stay was set up to, and the lee on the port side of the bowsprit breaking, which the port jib stay was rove through. The foremast broke off about nine feet above the deck, and the mainmast at the saddle. The mainmast broke in three places. This happened at a distance of about six miles from Winter Quarter light-ship. No one was on deck at the time but the mate [A. C. Browne] and another man. There were six men, all told, on the vessel. We let go the small anchor soon after, but the chain parted. We then let go the large or sheet anchor, with 70 fathoms of chain, and the ship swung round to the wind and sea. We then cleared away the spars that were hanging over the side of the vessel. The gaff and topmast and head of the mainmast went overboard. The rest of the masts were left on deck. They fell over to the port quarter. When the mast came down, it broke the davit on the port side, and stove the boat. The ship's boat was destroyed by the falling masts. No injury was done to the deck. The houses were injured to some extent. After the masts came down there was a reef breeze from S. S. W., the sea heavy, and the weather smoky, so that we could see but a short distance. The ship was leaking, but we could not discover the source of leakage. We pumped her out every 15 minutes for about two hours, and when we left her there was two feet of water in her hold. We left her about eight hours after the masts fell, or 9 a. m. on the 24th March. The sea when the masts fell was such that the ship would take water over her bow lying at anchor. We left the ship on the boat of the steamer John Hopkins, Hallett, master, bound from Boston to Baltimore, via Norfolk, which came in sight on the morning of the 24th. We left the ship because she was entirely disabled, and there was no suitable boat to help ourselves with. I did not ask Capt. Hallett to take her in tow and carry her into port. The sea was too heavy. He had the privilege of taking her after we had abandoned her. I did not think it worth while to ask him about these matters. We left her on Friday. She was taken in tow on the next morning (Saturday) by the steamer Wm. Crane, Howe, master, bound out from Baltimore to Boston, and carried back to Norfolk. I went there from Baltimore, and saw her the following Tuesday afternoon, the 28th. When I landed from the John Hopkins I made no efforts to carry relief to the vessel and to save her. I thought she would sink. The entire pumping we did before we left her was equal to an hour. I did not ask the captain of the Hopkins to take off any part of the cargo." The testimony of A. C. Browne, mate of the James Martin, does not differ in substance from that of her master. He says that the crew all thought that, if the Hopkins had not taken them off, they would have been all lost. He says that after they left their vessel they took no steps to save her, except that they left her anchored. They thought she would sink, and her crew all thought themselves lucky in saving themselves as they did. He says that his captain said to Capt. Hallett, of the Hopkins, that his vessel was sinking. He says that he thought that the collision did disable the Martin to some extent. There were six men on the Martin on this voyage. Only three were examined on the part of the owners, viz. Rowland Howes, the employé of the part owner, William H. Browne; A. C. Browne, the brother of this part owner, whose interest was insured; and the steward, who knew or affected to know nothing of the material facts of the collision and of the falling of the masts.

The vessel, on being brought into Norfolk, was found to have a hole cut in her deck, about 10 inches long and 6 inches wide, tapering to a smaller size at the bottom. Her hatches were fastened down. The hole in the deck was a little aft of amidship, at the lowest point of the deck, where, when loaded,

it would be about 4 feet above the water. The scupper near this hole was found to be stuffed with rags and other rubbish. Efforts had been made to cut through the deck in and under the water closet in the cabin, but the deck was not actually cut through at this place. The schooner was towed from Norfolk to Richmond in charge of Mr. Cowardin, the president of the insurance company before mentioned, which held the insurance on the cargo. On arriving at Richmond, port wardens found the hatches properly fastened down. Fox, one of the witnesses, says the fore rigging on the starboard side, lying on deck, bore every appearance of having been cut, and cut somewhere between the rail and the mast head. Witness Allison, one of the libelants, says the starboard stays of the foremast were cut. Allen, a witness, and a stockholder in the insurance company, and an experienced sailor, says: "The starboard fore rigging had been cut eight or ten feet, or more, from the deck. The seizings of the forestay had been cut, which left it free to go. They were cut,—all of them. The effect upon the masts, of cutting the seizings, would certainly be to carry them away over the side of the ship, if there was any motion of the vessel at sea." He did not think the schooner had been in collision, as the hull was not damaged, and certainly her jib boom and bowsprit would have been carried away. From the general evidence apparent, he did not think his port bow indicated a blow from the outside. He saw no injury except at the cat head, a space of six or eight inches. The rail by the cat head was broken down, but there was no injury to the deck or plank sheer. The cargo was found damaged to the extent of about $12 a ton, chiefly at the part of the vessel under the hole that was cut in the deck. The vessel was not in a leaking condition, and had not been since taken in tow by the steamer Crane; at least, not more so than vessels ordinarily are while loaded and making a voyage. The insurance company, which is one of the libelants, had to pay $1,800 as salvage on the cargo, and $2,007 to Allison & Addison, the consignees, for damages to the cargo. The freight contracted to be paid to the ship was $390. The insurance company paid towage bills and other expenses nearly equal to that amount.

S. H. Matthews, one of the part owners of the Martin, testifies, among other things, that, after hearing of the collision, he was told of a schooner lying at Charlestown, Mass., which was loading with ice for Charleston, S. C., which was said to have collided with an unknown vessel. He went to see her, and had some talk with her master, who said a collision had happened. He found, upon examination, this schooner's mainstay was broken on starboard bow, and anchor stock broken, and various scratches on the hull of the starboard bow. After going to the custom house in Boston, where he made some examinations, he again saw the master, who admitted to him that he had been in collision about the point and time at which the Martin had collided. This was a three-masted schooner,—the William H. Baily, of New York. Matthews told the captain of the schooner that he had employed counsel in Boston to libel his vessel. The brothers of Matthews, who were part owners of the Martin with him, also told the captain of the Baily that they were going to libel, and that he had better go to New York and prepare bonds, so as to be ready for the libel. The sequel was that the schooner Baily went away from Boston, was not libeled, and gave no bonds, and that no steps have been taken to libel her, either in New York, Charleston, Boston, or elsewhere.

Under a consent order of sale entered by this court, the Martin was sold in Norfolk, and brought less than $1,500. It does not appear that any of her owners, other than William H. Browne, had their interests insured, or had knowledge that William H. Browne had employed a temporary substitute as master for this voyage.

Sharp & Hughes, for libelants.
Ellis & Thom, for respondents.

HUGHES, District Judge. The original libel in this case, filed on the 24th of April, 1882, by the owners of the cargo and their insurers, claims damages for tort charged to have been committed by the master and crew of the James Martin, in having cut away her masts,

and cut holes in her hull, and abandoned her to perish at sea. The amended libel, filed at the hearing, claims damages from the failure of the master and crew to bring the vessel into port, because of bad seamanship and the unseaworthiness of the vessel. The owners make a cross claim for the freight contracted to be paid on the cargo. When the schooner was brought into Norfolk, on the 24th of March last, her master and crew were under grave suspicion of having dismasted and scuttled their vessel and deserted her at sea. When, on the day before, the steamer John Hopkins, from Boston for Baltimore, came in sight of them, and took the whole crew of the schooner on board, the master so impressed Capt. Hallett with the belief of the hopeless plight of the schooner alleged to be leaking and sinking that he came away, and brought her crew off, without deeming it worth while to make any examination into the true condition of things. When, 24 hours afterwards, the steamer William Crane, from Baltimore and Norfolk for Boston, came near the schooner Martin, she was found not to be seriously leaking, and not to be sinking; and Capt. Howe, of the Crane, found no difficulty in doing, in the absence of the schooner's master and mate, what Capt. Hallett had not done when they were present. He took the schooner in tow, reversed his own trip, and brought her back to Norfolk. When the schooner arrived here she was found to have a hole cut in her deck, in its lowest bend downwards, nearest the water, about midships, and the scupper near it was found to be plugged up with rags. On being taken to Richmond, and unloaded of her cargo, the latter was found to have received its principal damage from water in that part lying just under this hole in the deck,—a fact which indicated that the water causing this damage had come in through this hole while the schooner was in a position to be swept over by the sea; this latter fact indicating that the hole had been cut in the deck while the schooner was out at sea, some-time before she was brought within the capes of the Chesapeake. Mr. Matthews, one of the part owners, claimants, and respondents, was in Richmond about the time the Martin was taken up there, and negotiated a dismissal of the libel for salvage which had been put upon the schooner here on her first arrival in Norfolk. He could not have failed to hear at Richmond the charges against the master and mate of the schooner, which are embodied in the original libel before me. He must have appreciated the importance to the reputation of these two officers, and to the character of the schooner's owners, especially of William H. Browne, of meeting these charges by the evidence of the entire crew of the Martin, and by the evidence of all on board of the three-masted schooner with which he states she had been in collision on the night of the 22d of March, 1882. Naturally this court had a right to expect that all the crew of the Martin would have been examined in such a case as this. Yet only three of them have been examined, and the failure to examine the rest is wholly unaccounted for, although it is in proof that one of those others was for some time in a hospital at Norfolk. Such an omission, unaccounted for, in cases like this, has always been looked upon by admiralty courts as prejudicial to the case of

the vessel charged to be at fault. Moreover, the witnesses actually examined are those least disinterested in the suit. The part owner, whose interest in a schooner 25 years old is insured, and who did not make this particular voyage with his vessel as master, telegraphed from Boston for a temporary substitute, and sends this substitute on this voyage as temporary master; this part owner's brother being mate. This temporary master and this mate are the only persons examined of this crew, except a steward, who seemed to have been always below deck asleep, who insisted that he knew nothing, not even the names of his companions of the crew, and whose intelligence was probably as dark as he represented it to be. Again, it was of the highest importance to the case of the respondents in this court that they should have libeled the three-masted schooner with which they claim the Martin to have been in collision off Cape May,—if for no other purpose, at least to establish the fact of collision, and to show that the fault was not that of the master and crew of the Martin. The evidence before me is wholly ex parte as to that other vessel, and the testimony of the crews of vessels which have been in collision is proverbially unreliable. The testimony of the crews of each of these two vessels as to that collision ought to have been taken under oath and under cross-examination; otherwise it would have been, in that litigation, worthless. How can it be any better in this, where it is the whole truth that is essential to the formation of a just conclusion. But although the owners of the Martin themselves testify that they had abundant opportunity to libel the three-masted schooner, which they called the "William H. Baily of New York," yet they have not done so. In Boston they tried to maneuver with the master of the alleged schooner, to induce him to get out of the way of their libel. They could have libeled her during several days while lying at or near Boston. They told her master that they had arranged to libel her after a certain fast day, and to get his vessel ready, and they say he went off with his schooner before they got their libel out. If, therefore, these people have a good case, they have failed to support it with the evidence most necessary and proper for its vindication; that is to say, they have omitted to examine three of their own crew to sustain the statements alleged in their defense, and these three were the men who were wholly disinterested in the result of the suit. They have not libeled the schooner which they claimed to have collided with, nor examined any of her crew as to the alleged collision, although they insist that in this collision originated the disaster to their vessel. Nor have they accounted for these omissions. When we come to examine the testimony of their own master and mate as to the causes of the misfortunes of the schooner Martin, their explanations prove to be radically unsatisfactory. They say they were running southward, abreast of, and six miles off from, Cape May, on the night of the collision, with wind W. N. W. (when it was two points abaft their beam), and that they were closehauled and on the starboard tack. They say that the three-masted schooner was standing northward with wind W. N. W.

at that time, and yet that she was sailing with a free wind, and on a port tack. These statements are, by physical and mathematical necessity, untrue. Moreover, these officers say that the vessels collided by the Baily's starboard bow running into the Martin's port bow; and Mr. Matthews testifies that the port bow of the Martin, as he saw it at Richmond, was rubbed and abraded, and that the starboard bow of the Baily, as he saw her in Boston, was likewise rubbed and bruised, and that he saw a workman obliterating the mark or bruise on the Baily. Now, it is absolutely impossible that such a collision could have occurred between these two vessels, unless one or the other of them had entirely reversed her course; and there is no mention or intimation of such a reversal in the testimony of either the master or mate of the Martin. Counsel for the Martin suggests that she might have been sailing at the time of collision on a course to bring her under the land, say, S. W. by W., and that such a course would bring her close to the wind. But she was then opposite Cape May, north of the mouth of the Delaware Bay, and such a course as that suggested would have taken her into the mouth of the bay. She could not have been aiming to enter the bay; and, even if she had been, her port would then have been turned still further away from the other schooner, and her course would have rendered it still more impossible for the Baily to have run into her port bow with her own starboard bow. In short, I find it impossible to believe the statements of the master and mate on this subject,—a fact which naturally and necessarily discredits their whole testimony. The Martin was sailing with the wind free, the Baily was sailing close to the wind, and the rule of the road (Rule 17, Rev. St. § 4233) made it the duty of the Martin to keep out of the way of the Baily. If, therefore, there was a collision, it was by fault of the Martin, and she is responsible for all the consequences to the cargo for that fault. The statements of the master and mate as to the dismasting of the schooner are almost as incredible. They admit that they examined the rigging of the schooner shortly after the collision, and found the essential parts of it intact. They proceeded on their course for three hours on a rough sea, but after that period, all the way to Chincoteague, some 60 or 70 miles, the sea was "comparatively smooth," and the wind was "moderate." The wind was shifting all the rest of the night after the collision, all of the next day, and the first part of the next night, so that it had got entirely around the compass. There is no complaint of a storm, though the sea was heavy, and the wind was blowing a reef breeze. At 2 p. m. on the morning of the 24th the masts suddenly went down. What was the cause of this misfortune? The testimony of the witnesses examined at Richmond was that the starboard fore rigging was cut. So is that of Mr. Cowardin, who was on board the Martin from soon after she was brought into port at Norfolk until she was taken to Richmond. This rigging was cut some nine or ten feet above the deck. The masts fell over in the direction two points on the port quarter, showing that the fore rigging on the starboard side was at fault. The vessel had

gone on her course for 26 hours after the collision. Examination had shown that the essential parts of the rigging were intact shortly after the collision. Though it had been subjected to greater or less strain for the first 3 hours after that event, it had stood the strain. Then there was a "smooth sea" and a "moderate" wind for 20 hours, during which there could have been no strain. Then, without the agency of any vis major, in the shape of either high storm or heavy sea, the masts went down opposite the quarter where the rigging was found afterwards to have been cut. This is not a criminal prosecution, in which a court must require full proof of crime, but a civil suit, in which a court is bound to decide upon the preponderance of evidence positive and circumstantial. With every disposition to presume innocence, I cannot persuade myself that the falling of these masts was the result of any vis major of navigation, especially as it occurred at a desolate point on the coast, where violence to the vessel could find more of a chance of immunity and concealment than at probably any other point on the North Atlantic seaboard. But, even if the masts did fall by stress of weather and sea, still there was no justifying cause for the subsequent abandonment of the schooner by the master and mate. It is true that the chance of escape was cut off by the accidental destruction of their boat in the falling of the masts, but where was the necessity for escape at all? They could safely remain on board until help came from some quarter, and there was nothing in their condition to throw them into a panic of fright. If they were under the influence of such a panic before the Hopkins came in sight, they were needlessly so, and the certainty of rescue should have calmed them. Their vessel was not sinking. It was not even leaking considerably, but only to the extent to which the best of vessels are liable at sea. But they did more than escape. When they got aboard the Hopkins their trepidation should have entirely subsided; and they violated their duty as seamen to their ships, its owners, and to the cargo, by so exaggerating the condition of their vessel, in their statements to Capt. Hallett, as to induce him to sail away without attempting to save their ship. This is all proved by the sequel; Capt. Howe, of the Crane, having found the schooner riding safe at anchor, without much water in her hold, not in a leaking condition, and capable of being towed upon a right rough sea into harbor. The Boston steamers all stop for several hours at Norfolk, both on their trips in and out. When the Hopkins came into this harbor with the crew of the Martin on board, the first duty of the master and mate of the Martin was to take steps to have her looked after and saved, if practicable, which it certainly was. They took no such steps. So far as any evidence exists, they gave no publicity in Norfolk to the fact that their vessel was anchored out at sea, within a few hours' sail of Norfolk, in distress and danger. We have no evidence that they did anything or said anything while here for the rescue of their vessel, and they went on to Baltimore, where they would seem to have been equally reticent and inactive.

I am of opinion that whatever accidents are described in the evi-

dence as having happened to the James Martin happened by the fault of her master and crew; especially that the collision, if it occurred at all, was by their fault; and that the dismasting of the vessel was either through their act, or through their negligence or incompetency in not properly staying the masts previously to their falling.   I am of opinion that the vessel was abandoned unnecessarily—was in fact deserted—by her master and crew, under circumstances in which their duty as seamen demanded that they should have stood by her; at least, to the extent of prevailing upon Capt. Hallett to do, under their supervision, what Capt. Howe did on the next day after they had deserted her.   I am of opinion that, on being brought by the Hopkins into the port of Norfolk, the master and mate of the schooner ought to have taken effective steps for bringing their vessel into port, and should have hired a powerful wrecking tug, and gone themselves out to the place of anchorage, and themselves brought their vessel and her cargo into port, and saved salvage.   I am of opinion that, having failed to do this at Norfolk, they should have done it in Baltimore.   I am of opinion that, by omitting this natural and obvious duty, they themselves furnished strong evidence to sustain the suspicion that their desertion of the ship was premeditated and criminal.   I am of opinion that the James Martin, in consequence of this bad seamanship of master and crew, is liable for the amounts paid for salvage and as damages to the cargo by the libelants.

As to the question of the freight: This was a clear case of an abandonment at sea of the vessel and cargo by the master and crew, without intention to retake possession.   Where this is done, and where the owners of the cargo have done no wrongful act themselves, it is settled law that the ship owners can maintain no claim to the freight.   The contract of affreightment, indeed, is not at an end, because it exists to form the foundation of a suit for damages to the cargo, by its owners, as in the case at bar.

The damages that will be awarded in this cause, from the negligence of the master and crew, will be $1,800 for salvage paid, $2,007 for damages to the cargo, and costs of this suit.   The libel is in rem only, and the vessel brought, on a sale under a consent decree, only about $1,500.   Now, if the proceeds of this sale had been sufficient to cover this whole claim for salvage and damages, together with costs, I might be bound to listen to argument on behalf of the owners for the freight.   But the large excess of the amounts claimed by libelants over and above the proceeds of sale, and the large deficiency, for which the libelants have no recourse here whatever, preclude such an inquiry in this proceeding.   I will sign a decree denying the respondents' claim for the freight, and awarding to the libelants the amounts above indicated, to be paid, as far as may be, out of the proceeds of the sale of the ship.